FILED by ___ D.C.
ELECTRONIC

Nov. 18, 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. ___________________-CIV**

**08-23210-CIV-MOORE/SIMONTON**

**FISK ELECTRIC COMPANY,**

**Plaintiff,**

**v.**

**TRAVELERS CASUALTY AND SURETY COMPANY**

**and**

**AMERICAN HOME ASSURANCE COMPANY**

**and**

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

**Defendants.**

## COMPLAINT

**COMES NOW,** Plaintiff Fisk Electric Company ("Fisk") for its Complaint against Defendants Travelers Casualty and Surety Company ("Travelers"), American Home Assurance Company ("American Home"), and Fidelity and Deposit Company of Maryland ("Fidelity"), and alleges that it is entitled to relief upon the following facts:

### The Parties

1. Fisk is a corporation incorporated under the laws of the State of Texas having its principal place of business in the State of Texas. Fisk is the electrical contractor to Kiewit Southern Co., f/k/a Gilbert Southern Corp. ("Kiewit") on the construction of the Miami International Airport H-J Utility and Pavement Project, No. B315A, Annex 12 ("H-J Project"). Kiewit is the contractor to Parsons-Odebrecht Joint Venture ("POJV"), which is the agent and

construction manager for Miami-Dade County for the new South Terminal Expansion Program at the Miami International Airport, which includes the H-J Project.

2. Travelers is a corporation incorporated under the laws of the State of Connecticut having its principal place of business in the State of Connecticut. Travelers is a common law payment bond surety on Bond No. 41SB103962878BCM for the H-J Project, whereon Kiewit is identified as principal.

3. American Home is a corporation incorporated under the laws of the State of New York having its principal place of business in the State of New York. American Home is a Little Miller Act payment bond surety on Bond Nos. 085771771 and 2863671 for the H-J Project, whereon POJV is identified as principal.

4. Fidelity is a corporation incorporated under the laws of the State of Maryland having its principal place of business in the State of Maryland. Fidelity is a Little Miller Act payment bond surety on Bond Nos. 085771771 and 2863671 for the H-J Project, whereon POJV is identified as principal.

5. The Defendants are sureties who are authorized, licensed, and admitted to do business under the laws of the State of Florida.

**Jurisdiction And Venue**

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7. Pursuant to 28 U.S.C. § 1391(a)(2), venue lies in the Southern District of Florida because a substantial part of the events and omissions giving rise to the claims occurred in this

District and because a substantial part of property that is the subject of the action is situated in this District.

**Facts Common To All Counts**

8. Miami-Dade County ("Miami-Dade") owns Miami International Airport.

9. In 2001, Miami-Dade undertook the new South Terminal Expansion Program that consisted of four major projects: H-J Project, South Terminal Building, Concourse J, and Concourse H.

10. POJV was the agent and construction manager for Miami-Dade for the new South Terminal Expansion Program, which includes the H-J Project.

11. The H-J Project consisted of drainage structures, electrical and communications duct banks, water, sewer, storm sewer, interceptors, water, hydrant fuel piping and fuel hydrants, and other utilities for the South Terminal Program. It also consisted of new pavement (asphalt, concrete, and heavy duty pavement) for the new Concourse J, associated taxi-lanes, remote hardstands, reconstruction of various roads, an Airside Operations Area ("AOA") Perimeter Noise/Blast wall, a new triturator structure, and a new South East AOA Access Gate.

12. On December 12, 2002, Kiewit entered into the Prime Contract with POJV for the H-J Project.

13. On or about December 13, 2002, Kiewit entered into a subcontract with Fisk to i) install underground duct banks and feeders, perimeter fence lighting, emergency fuel shut off, leak detection systems, permanent airfield lighting systems, etc. and ii) to provide and maintain the temporary lighting for the airside operations for the H-J Project (the "Subcontract"), copy attached hereto as **Exhibit 1.**

14. In connection therewith, Kiewit, as principal, and Travelers, as surety, executed and delivered their common law payment bond (the "Kiewit Payment Bond") to POJV, as obligee, for the H-J Project, copy attached hereto as **Exhibit 2.**

15. On December 18, 2002, after contracting with Kiewit, POJV recorded its Little Miller Act payment bond for the H-J Project ("POJV Payment Bond"), copy attached hereto as **Exhibit 3.** Under the POJV Payment Bond, POJV is the principal, American Home and Fidelity are the sureties, and Miami-Dade is the obligee.

16. Based on statements in its Subcontract (as authorized by POJV) and other misrepresentations and omissions, Fisk was led to believe that Kiewit was the prime contractor for the H-J Project and that POJV was the construction manager and agent of Miami-Dade.

17. One example of such statements in Fisk's Subcontract was the first recital on page 1:

> WHEREAS, Contractor has entered into a contract dated the 12 day of December, 2002, ("Prime Contract") with Parsons-Odebrecht J.V., ("Owner"), for the construction of HJ Apron: Construct new Aircraft Apron, taxiway and utilities, Project No. B315A, ("Project"), at Miami Dade County, FL; and

18. It was not until the Summer of 2008, that Fisk learned that POJV was a construction manager at-risk and the prime contractor for the H-J Project and that pursuant to the Little Miller Act, it had provided a Little Miller Act payment bond.

19. Fisk reasonably anticipated that the plans and specification provided to them by Kiewit, on which it relied in preparing its subcontract price, were fully designed and reasonably coordinated among the various design disciplines (mechanical, electrical, structural, architectural, baggage handling, etc.) and among the four major projects for the overall South Terminal Expansion Program.

20. However, POJV and Miami-Dade knew that the plans and specifications were incomplete and that the design had not been coordinated among the trades and the four major projects when they put them out for bid, which they never disclosed to anyone.

21. The design for the South Terminal Expansion Program, which included the H-J Project, was constantly evolving, resulting in thousands of changes to the electrical, mechanical, sprinkler, and drywall/ceiling trades, more than doubling the original base contract value.

22. The massive and pervasive scope and corrective changes occurred while Fisk was actively engaged in base contract work and could not be incorporated into any work plan. The cumulative effect of the inordinate number of change orders severely impacted Fisk's labor productivity.

23. There were no effective updated Overall Project Schedules ("OPSs") for the South Terminal Expansion Program issued by POJV that anticipated the huge amount of design changes being issued, and without an updated, effective advance work plan, Fisk's electrical performance was radically changed to a piecemeal, "catch-as-catch-can," service call basis, rather than performing its exterior electrical and other systems work in an orderly systematic, productive manner, as originally contemplated.

24. Fisk's work was also impacted due to unavailability of work areas because of late completion of other related South Terminal Expansion Program projects (i.e. South Terminal Building and Concourse J), which was the responsibility of POJV and/or Miami-Dade. The Fisk electrical and other systems work was specifically tied into the power and conduits for South Terminal Building and Concourse J.

25. Responses from Kiewit, POJV, and Miami-Dade to Fisk's multitude of Requests for Information ("RFIs") regarding the design deficiencies were untimely, unresponsive, and/or inadequate, which contributed to the disrupted manner of Fisk's performance.

26. In 2006, Kiewit, POJV, and Miami-Dade entered into the first Global Settlement. Kiewit did not allow Fisk to participate in the first Global Settlement, and it did not pay Fisk any of the amounts it obtained from the settlement.

27. Fisk's installation work on the H-J Project was severely impacted by late, piecemeal availability of work areas, late completion of precedent construction activities by others, the late availability of permanent power, and most importantly, design errors and omissions, as well as, untimely and inadequate responses to RFIs.

28. Fisk had to maintain for an extended duration critical airside temporary maintenance of air traffic lighting, which resulted in additional costs for materials (bulbs, cables, transformers, etc.) and maintenance labor.

29. The impacts and disruptions adversely impacted Fisk's planned performance, requiring "service-call," "catch-as-catch-can," out-of-sequence, piecemeal-type operations, in lieu of a logical, productive, continuous flow as originally bid and planned by Fisk.

30. Due to the disrupted, out-of-sequence, piecemeal performance, Fisk was required to perform in a radically different adversely impacted manner, which substantially increased its out-of-pocket costs for labor, labor benefits, on-site supervision, on-site project management, construction support equipment, and other on-site general conditions.

31. Both Kiewit and POJV recognized that Miami-Dade was, in fact, responsible for the increased costs of Fisk's performance as a result of the cumulative effects of the excessive changes not contemplated at the time the parties entered into their original agreement.

32. Kiewit and POJV engaged in a pattern of partially certifying Fisk's impact claims and recommending partial payments of Fisk's claims, yet never paid for these extra costs to Fisk.

33. In the Fall of 2008, Kiewit entered into a final settlement with POJV and Miami-Dade, but it did not pay Fisk any of the amounts it obtained from the settlement.

34. Fisk has performed all duties entitling it to payment.

35. The last date that Fisk furnished labor under the Subcontract was on or about November 25, 2007, which was within one year of the filing of this Complaint.

36. Fisk engaged the services of undersigned counsel to represent it in this litigation and is obligated to pay a reasonable fee to its counsel, which fee is recoverable pursuant to the terms of relevant contracts and Fla. Stat. §§ 713.23, 255.05, 627.428(l), and 627.756.

**Count I – Claim Against The Kiewit Payment Bond For Breach Of Contract (Against Travelers)**

37. Paragraphs 1 through 36 above are incorporated by reference as if fully set forth herein and Fisk further alleges:

38. In 2006 and 2007, Fisk submitted Requests for Equitable Adjustment ("REAs") to Kiewit for the aforementioned out-of-pocket, increased costs for labor, materials, and equipment, which totaled $889,259. Fisk's REA included its additional, out-of-pocket costs for labor, materials, and equipment for the additional temporary lighting on the airside operations in order to accommodate the radical change from the originally agreed upon schedule and its increased, out-of-pocket costs for labor, labor benefits, on-site supervision, on-site project management, construction support equipment, and other on-site general conditions caused by the radically different adversely impacted manner which Fisk was forced to perform under.

39. Kiewit has breached the Subcontract by failing to fully certify the REA to POJV and Miami-Dade, by failing to issue a change order for the REA, and by failing to pay Fisk the amounts due.

40. In addition, Kiewit breached the Subcontract by failing to pay $14,885 to Fisk for Time & Material work performed by Fisk at the direction of Kiewit and POJV.

41. Further, Kiewit breached the Subcontract by failing to pay $377,655 to Fisk for unpaid contract billings and retention withheld on completed work.

42. Travelers, as payment bond surety for Kiewit, is responsible for Kiewit's payment failure.

43. As a result of Kiewit's breaches of its expressed and implied duties, Fisk has been damaged by nonpayment in the total amount of $1,281,799 for said labor, services, and materials provided.

44. All conditions precedent to the bringing of this action have been performed, have been satisfied, or have been waived.

**WHEREFORE,** Fisk prays that this Court will:

a. Enter judgment for damages against Travelers, plus attorney fees, interest, and costs.

b. Grant such other equitable relief deemed appropriate.

**Count II – Claim Against The POJV Payment Bond For Breach Of Contract (Against American Home And Fidelity)**

45. Paragraphs 1 through 36 and 38 through 41 above are incorporated by reference as if fully set forth herein and Fisk further alleges:

46. As a result of Kiewit's breaches of its expressed and implied duties, Fisk has been damaged by nonpayment in the total amount of $1,281,799 for said labor, services, and materials provided.

47. American Home's and Fidelity's failure to pay Fisk is a breach of the conditions of the POJV Payment Bond.

48. All conditions precedent to the bringing of this action have been performed, have been satisfied, or have been waived.

**WHEREFORE,** Fisk prays that this Court will:

a. Enter judgment for damages, jointly and severally, against American Home and Fidelity, plus attorney fees, interest, and costs.

b. Grant such other equitable relief deemed appropriate.

**Count III – Claim Against The Kiewit Payment Bond For Cardinal Change/Contract Abandonment (Against Travelers)**

49. Paragraphs 1 through 36 above are incorporated by reference as if fully set forth herein.

50. Pleading in the alternative, Fisk further alleges as follows:

51. For the H-J Project, Fisk faced uncontemplated, adverse working conditions and radically different, piecemeal, unplanned performance in lieu of performing the work in an orderly sequence according to updated and adequate schedules that were caused by the cumulative effect of unprecedented design changes in the South Terminal Expansion Program and that severely disrupted the performance of its electrical and other systems work.

52. Due to the impacted, radically changed, piecemeal-type performance and the unforeseeable adverse working conditions, Fisk's work, as performed, was fundamentally and

radically different from the scope of the work contemplated or bargained for by the parties before entering into the original, written Subcontract.

53. Fisk's work was thus extensively, radically, and fundamentally altered, so as to constitute a cardinal change well beyond the scope of the original, written contract, or in the alternative, an abandonment of the original contract.

54. By their words and actions, POJV, Kiewit, and Fisk agreed that the cumulative effect of the multitude of inordinate changes had a substantial impact on Fisk's labor costs and that Fisk entitled to be paid for the resulting additional costs. This implied-in-fact agreement was agreed to writing, orally, and by the parties' actions.

55. Kiewit knew that Fisk was performing the work for its benefit, and it understood and intended that just compensation was to be paid to Fisk for its performance in this radically different manner.

56. Fisk is entitled to recover the unpaid reasonable value of the labor, services, and materials provided.

57. The reasonable value of the labor, services, and material provided by Fisk for the H-J Project totals $2,060,520, but Fisk has only been paid $939,145. Kiewit has failed to pay Fisk $1,121,375 for the unpaid reasonable value of the labor, services, and materials it provided.

58. Travelers, as payment bond surety for Kiewit, is responsible for Kiewit's payment failure.

59. All conditions precedent to the bringing of this action have been performed, have been satisfied, or have been waived.

**WHEREFORE,** Fisk prays that this Court will:

a. Enter judgment for damages against Travelers, plus attorney fees, interest, and costs.

b. Grant such other equitable relief deemed appropriate.

**Count IV – Claim Against The POJV Payment Bond For Cardinal Change/Contract Abandonment (Against American Home And Fidelity)**

60. Paragraphs 1 through 36 and 51 through 56 above are incorporated by reference as if fully set forth herein.

61. Pleading in the alternative, Fisk further alleges as follows:

62. The reasonable value of the labor, services, and material provided by Fisk for the H-J Project totals $2,060,520, but Fisk has only been paid $939,145. Kiewit has failed to pay Fisk $1,121,375 for the unpaid reasonable value of the labor, services, and materials it provided.

63. American Home's and Fidelity's failure to pay Fisk is a breach of the conditions of the POJV Payment Bond.

64. All conditions precedent to the bringing of this action have been performed, have been satisfied, or have been waived.

**WHEREFORE,** Fisk prays that this Court will:

a. Enter judgment for damages, jointly and severally, against American Home and Fidelity, plus attorney fees, interest, and costs.

b. Grant such other equitable relief deemed appropriate.

**JURY DEMAND**

65. Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: November 17, 2008

Respectfully submitted,

/Herman/Braude/

Herman M. Braude, Esq. (FBN 148644)
Richard Y. Rho, Esq. (FBN 660191)
BRAUDE & MARGULIES, P.C.
1200 Potomac St., N.W.
Washington, DC 20007
Tel: (202) 471-5400
Fax: (202) 471-5404
hbraude@braudemargulies.com
rrho@braudemargulies.com

# Exhibit 1

Form 11-a (rev. 1/98)

601095
FILE #1

# SUBCONTRACT

_DBE, _WBE, X Minority Req N/A

Company No. 44

Taxpayer Account No. 74-0626360

Job No. 1715

Subcontract No.______

**THIS AGREEMENT**, made this 13, day of December, ~~2003~~ 2002, by and between Fisk Electric Company, ("Subcontractor"), Address: 10125 NW 116th Way #14, Miami, FL 33178, Telephone No.: (305) 884-5311, FAX No.: (305) 884-2192, and Gilbert Southern Corp., ("Contractor"), Address: 450 Dividend Drive, Peachtree City, GA 30269, Telephone No.: (770) 487-2300, FAX No.: (770) 487-0005.

**WITNESSETH:**

**WHEREAS**, Contractor has entered into a contract dated the 12 day of December, 2002, ("Prime Contract") with Parsons-Odebrecht, J.V., ("Owner"), for the construction of HJ Apron: Construct new Aircraft Apron, taxiway and utilities., Project No. B315A, ("Project"), at Miami, Dade County, FL; and

**WHEREAS**, Subcontractor desires to perform a portion of such Prime Contract as described more fully below.

**NOW THEREFORE**, it is agreed as follows:

**Article 1.** Subcontractor agrees to furnish all supervision, labor, tools, equipment, materials and supplies necessary to perform, and to perform, the following described work ("Work") in accordance with the terms and conditions of the Prime Contract and this Subcontract:

**SEE ATTACHED ARTICLE 1 "THE WORK"**

**Article 2.** Contractor agrees to pay Subcontractor for the performance of this subcontract as specified herein, the sum of Eight Hundred Ninety Six Thousand Two Hundred Seventy Three and 58/100 Dollars ($896,273.58) adjusted as required by differences between estimated and actual quantities for unit price Work items and subject to changes, additions and deductions, as hereinafter provided in the General Provisions. Contractor shall withhold 10% of any partial payment as retainage until Final Payment.

**Article 3.** ***The General Provisions, together with any Additional Provisions, are attached hereto and made a part of this Subcontract.***

**IN WITNESS WHEREOF**, the parties hereto have executed this Subcontract by their proper officers or duly authorized agents.

| Gilbert Southern Corp. | | Fisk Electric Company | |
|---|---|---|---|
| Contractor | | Subcontractor | |
| By [signature] | Title | By [signature] | Title Vice President |

Subcontractor's Copy-White; Home Office Copy-Canary; Job Office Copy-Pink; District Office Copy-Gold

Apron / Job No. 44-1715
Project No. B315A

Subcontractor: Fisk Electric Company
Subcontract Date: December 13, 2002

## ARTICLE 1 "THE WORK"

| ITEM NO. | BID ITEM | DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 1 | 01505-1 | MOBILIZATION | 1 | LS | $ 282,911.51 | $ 282,911.51 |
| 2 | 01570-1 | MAINT. OF MOT SYSTEMS | 189 | WK | $ 114.86 | $ 21,708.54 |
| 3 | 01570-6 | TEMP. MARKER LIGHTS | 48,000 | ED | $ 0.60 | $ 28,800.00 |
| 4 | 01570-7 | TEMP. POWER FOR MARKER LIGHTS | 1,000 | Day | $ 1.35 | $ 1,350.00 |
| 5 | P-151-7 | DISC. TO MAKE SAFE ONLY | 50 | EA | $ 20.58 | $ 1,029.00 |
| 6 | P-151-9 | DISC. TO MAKE SAFE ONLY | 1 | LS | $ 1,571.08 | $ 1,571.08 |
| 7 | P-151-10 | DISC. TO MAKE SAFE ONLY | 1 | LS | $ 1,335.42 | $ 1,335.42 |
| 8 | P-151-11 | DISC. TO MAKE SAFE ONLY | 1 | LS | $ 3,534.94 | $ 3,534.94 |
| 9 | P-151-12 | DISC. TO MAKE SAFE ONLY | 1 | LS | $ 9,586.41 | $ 9,586.41 |
| 10 | P-151-13 | DISC. TO MAKE SAFE ONLY | 1 | LS | $ 706.99 | $ 706.99 |
| 11 | P-151-14 | DISC. TO MAKE SAFE ONLY | 1 | LS | $ 942.65 | $ 942.65 |
| 12 | D-751-3 | COMMUNICATION MANHOLES | 7 | EA | $ 3,819.26 | $ 26,734.82 |
| 13 | D-751-4 | COMMUNICATION PULL-BOX | 2 | EA | $ 1,865.71 | $ 3,731.42 |
| 14 | D-751-6 | ELECT. MANHOLES | 7 | EA | $ 1,307.27 | $ 9,150.89 |
| 15 | F-162-1 | CHAIN LINK FENCE (GROUNDING ONLY) | 350 | LF | $ 1.61 | $ 563.50 |
| 16 | F-162-2 | TEMP. FENCE (GROUNDING ONLY) | 12,500 | LF | $ 0.56 | $ 7,000.00 |
| 17 | F-162-4 | 24' SECURITY GATE (GROUNDING ONLY) | 1 | EA | $ 629.03 | $ 629.03 |
| 18 | F-162-6 | TEMP. 12' SECURITY GATE (GROUNDING ONLY) | 3 | EA | $ 314.51 | $ 943.53 |
| 19 | F-162-7 | TEMP. 24' SECURITY GATE (GROUNDING ONLY) | 2 | EA | $ 629.23 | $ 1,258.46 |
| 20 | F-162-8 | OBSTRUCTION LIGHTS ON TEMP. AOA FENCE | 10,000 | ED | $ 5.21 | $ 52,100.00 |
| 21 | L-108-2 | 1/C #8 AWG 5KV CABLE | 8,000 | LF | $ 0.43 | $ 3,440.00 |
| 22 | L-110-1 | 2" RGS CONDUIT TO BARRIER WALL | 1,000 | LF | $ 9.84 | $ 9,840.00 |
| 23 | L-110-2 | CONCRETE ENCASED 2W4 COMM. DUCT | 275 | LF | $ 36.01 | $ 9,902.75 |
| 24 | L-110-8 | CONCRETE ENCASED 2W2 FUEL DUCT | 1,350 | LF | $ 16.51 | $ 22,288.50 |
| 25 | L-110-9 | CONCRETE ENCASED 3W2 FUEL DUCT | 950 | LF | $ 20.29 | $ 19,275.50 |
| 26 | L-110-10 | CONCRETE ENCASED 4W4 ELECT. DUCT | 1,040 | LF | $ 38.25 | $ 39,780.00 |
| 27 | L-110-11 | CONCRETE ENCASED 12W4 ELECT. DUCT | 150 | LF | $ 129.45 | $ 19,417.50 |
| 28 | L-110-12 | CONCRETE ENCASED 3W4 ELECT. DUCT | 250 | LF | $ 34.68 | $ 8,670.00 |
| 29 | L-110-13 | CONCRETE ENCASED 2W2 ELECT. DUCT | 240 | LF | $ 17.26 | $ 4,142.40 |
| 30 | L-125-1 | AOA WALL OBSTRUCTION LIGHTS | 60 | EA | $ 358.81 | $ 21,528.60 |
| 31 | L-125-2 | HIGH MAST POLE OBSTRUCTION LIGHT | 38 | EA | $ 476.72 | $ 18,115.36 |
| 32 | L-125-3 | L-852C TAXILANE CENTERLINE LIGHTS | 12 | EA | $ 1,012.99 | $ 12,155.88 |
| 33 | L-125-4 | L-852 UNIDIRECTIONAL EDGE LIGHT TAXILANE CENTER | 14 | EA | $ 1,177.77 | $ 16,488.78 |
| 34 | L-125-5 | STEEL GALV. B LANK COVERS | 18 | EA | $ 109.96 | $ 1,979.28 |
| 35 | L-130-1 | 20' GROUNDING UNIT | 23 | EA | $ 171.64 | $ 3,947.72 |
| 36 | L-130-2 | 30' GROUNDING UNIT | 23 | EA | $ 343.29 | $ 7,895.67 |
| 37 | L-130-3 | EXTRA 10' GROUND ROD | 23 | EA | $ 125.25 | $ 2,880.75 |
| 38 | L-130-4 | GROUNDING RECPT. IN PAVEMENT | 23 | EA | $ 235.20 | $ 5,409.60 |
| 39 | P-720-1 | EMERGENCY FUEL SHUT-OFF SYSTEM | 1 | LS | $ 31,434.59 | $ 31,434.59 |
| 40 | P-720-2 | LEAK DETECTION SYSTEM | 1 | LS | $ 43,128.58 | $ 43,128.58 |
| 41 | P-728-1 | CATHODIC PROTECTION SYSTEM | 1 | LS | $ 9,090.33 | $ 9,090.33 |
| 42 | P-740-1 | OIL/WATER SEPARATOR 800 GAL. | 1 | EA | $ 5,539.90 | $ 5,539.90 |
| 43 | P-740-2 | OIL/WATER SEPARATOR 1000 GAL. | 3 | EA | $ 6,334.97 | $ 19,004.91 |
| 44 | P-740-3 | OIL/WATER SEPARATOR 1200 GAL. | 2 | EA | $ 4,079.85 | $ 8,159.70 |
| 45 | S-2-6 | DISMANTLE EXISTING HIGH MAST POLES | 1 | LS | $ 1,625.86 | $ 1,625.86 |
| 46 | S-2-7 | GROUND ROD INSPECTION PIT | 38 | EA | $ 348.00 | $ 13,224.00 |
| 47 | L-110-14 | 1" RGS CONDUIT ON NOISE BARRIER WALL | 1,500 | LF | $ 4.57 | $ 6,855.00 |
| 48 | S-2-8 | 1/C #8 THHW COPPER WIRE | 3,000 | LF | $ 0.47 | $ 1,410.00 |
| 49 | S-2-9 | 1/C #10 THHW COPPER WIRE | 1,500 | LF | $ 0.38 | $ 570.00 |



MBC

Apron / Job No. 44-1715
Project No. B315A

Subcontractor: Fisk Electric Company
Subcontract Date: December 13, 2002

ARTICLE 1 "THE WORK"

| ITEM NO. | BID ITEM | DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 50 | S-2-10 | 1/C #3 XHHW COPPER WIRE | 43,800 | LF | $ 0.94 | $ 41,172.00 |
| 51 | S-2-11 | 1/C #8 XHHW COPPER WIRE | 21,900 | LF | $ 0.48 | $ 10,512.00 |
| 52 | S-2-12 | TRANSFORMER STEP-DOWN 3000VA | 7 | EA | $ 480.66 | $ 3,364.62 |
| 53 | S-2-13 | NEW SERVICE TO RE-PUMP STATION #2 | 1 | EA | $ 9,676.48 | $ 9,676.48 |
| 54 | S-2-14 | NEW SERVICE TO EXISTING BLDG. 3078 | 1 | EA | $ 8,759.13 | $ 8,759.13 |
| | | | | | *Total* | *$ 896,273.58* |

GILBERT SOUTHERN CORP.

Contractor

FISK ELECTRIC COMPANY

Subcontractor

.m 11-b (rev. 10/01)

# GENERAL PROVISIONS-SUBCONTRACT

**Section 1. CONTRACT DOCUMENTS.** (a) The term "Prime Contract" as used herein refers to all the general, supplementary and special conditions, drawings, specifications, amendments, modifications and all other documents forming or by reference made a part of the contract between Contractor and Owner.

(b) Subcontractor, by signing this Agreement, acknowledges that it has independently assured itself that all of the Prime Contract documents have been available to it, and confirms that it has examined all such documents and agrees that all of the aforesaid Prime Contract documents shall be considered a part of this Subcontract by reference thereto. Subcontractor agrees to be bound to Contractor and Owner by the terms and provisions thereof so far as they apply to the Work, unless otherwise provided herein.

(c) In the event Subcontractor or Contractor is a partnership of two or more entities, the term "Subcontractor" and "Contractor" as used throughout this Subcontract shall include the partnership and each of the entities comprising the partnership.

**Section 2. DELIVERY.** Materials furnished but not installed by Subcontractor shall be delivered F.O.B. jobsite unless otherwise provided in the Additional Provisions of this Subcontract.

**Section 3. PAYMENT.** (a) Partial payments will be made to Subcontractor each month, computed on the basis of the prices set forth above and the actual quantity of the Work performed, as estimated by Owner, less retainage and less the aggregate of previous payments, but such partial payments shall not become due Subcontractor until ten (10) days after Contractor receives payment for such Work from Owner. If Contractor receives payment from Owner for less than the full value of materials delivered to the site but not yet incorporated into the Work, the amount due Subcontractor on account of such materials delivered to the site shall be proportionately reduced. No partial payment to Subcontractor shall operate as approval or acceptance of Work furnished hereunder.

(b) Upon complete performance of this Subcontract by Subcontractor, and final approval and acceptance of Subcontractor's Work by Owner, Contractor will make final payment to Subcontractor of the balance due to it under this Subcontract within a reasonable time after full payment of such Work has been received by Contractor from Owner.

(c) If at any time prior to final payment hereunder Owner reduces the retainage withheld from Contractor, Contractor may, in its sole discretion, with the consent of Subcontractor's surety, reduce retainage withheld from Subcontractor.

(d) Contractor may deduct from any amounts due or to become due Subcontractor any sum or sums owed by Subcontractor to Contractor. Contractor may also exercise the right of set-off under this Subcontract as to any sums owed by Subcontractor and/or its affiliates under any other contract with Contractor and/or its affiliates. In the event of any breach by Subcontractor of any provision or obligation of this Subcontract, or in the event of the assertion by other parties of any claim or lien, including but not limited to third party claims, levies or garnishments against Contractor or the premises arising out of Subcontractor's performance of this Subcontract, Contractor shall have the right to retain out of any payments due or to become due Subcontractor an amount sufficient to completely protect Contractor from any and all loss, damage or expense therefrom until the situation has been satisfactorily remedied or adjusted by Subcontractor.

**Section 4. BONDING.** (a) Subcontractor shall furnish Performance and Payment Bonds in an amount equal to the full Subcontract price. Such bonds shall be on forms furnished by, and with a surety satisfactory to, Contractor. Premium for such bonds shall be paid by Subcontractor unless otherwise agreed upon in writing by the parties hereto.

(b) By signing this Subcontract, Subcontractor certifies that it has the bonding capacity and has made arrangements for furnishing said Performance and Payment Bonds to Contractor prior to beginning performance of the Work, and that the time required to prepare and furnish said bonds will not delay the start of the Work. Should Subcontractor proceed with the Work without first furnishing said Performance and Payment Bonds, whether or not such performance was permitted or encouraged by Contractor's job site representative, Subcontractor shall be deemed to have waived its right to partial payment and agrees to look to Contractor for payment of the amount due hereunder only upon furnishing said bonds or on completion of the entire Work and the furnishing of the releases described in Section 12. The furnishing of said bonds by Subcontractor is a condition precedent to Subcontractor's right to receive partial payment for Work performed hereunder. The waiver of partial payment shall not constitute an excuse or reason for nonperformance of this Subcontract by Subcontractor.

**Section 5. CHANGES.** (a) Contractor may at any time by written order of Contractor's authorized representative, and without notice to Subcontractor's sureties, make changes in, additions to and deletions from the Work to be performed under this Subcontract, and Subcontractor shall promptly proceed with the performance of this Subcontract as so changed.

(b) For changes in the Prime Contract that have been initiated by Owner, for acts or omissions of the Owner and for defects in the Prime Contract, Subcontractor shall submit any claims it may have, including notice thereof, for adjustment in the price, schedule or other provisions of the Subcontract to Contractor in writing in sufficient time and form to allow Contractor to process such claims within the time and in the manner provided for and in accordance with the applicable provisions of the Prime Contract. Subcontractor agrees that it will accept such adjustment, if any, received by Contractor from Owner as full satisfaction and discharge of such claim.

(c) For changes directed by Contractor which are not provided for under Subsection 5(b) above, Subcontractor shall be entitled to an adjustment in the Subcontract price, provided Subcontractor gives Contractor written notice of its intent to claim such an adjustment prior to performing such changed Work. Failure by Subcontractor to provide written notice as required herein for any changes to the work, or failure to provide written notice prior to performing any work or incurring any cost for which it believes it is entitled to claim additional compensation, whether or not directed by Contractor, shall be deemed to prejudice Contractor and shall constitute a waiver of any such claims by Subcontractor.

**Section 6. PROSECUTION OF WORK.** (a) Subcontractor shall furnish all labor, supervision, tools, equipment, materials and supplies necessary for the performance of this Subcontract in a proper, efficient and workmanlike manner. Subcontractor shall prosecute the Work undertaken in a prompt and diligent manner whenever such Work, or any part of it, becomes available, or at such other time or times as Contractor may direct, and so as to promote the general progress of the entire construction, and shall not, by delay or otherwise, interfere with or hinder the work of Contractor or any other subcontractor. Any materials that are to be furnished by Subcontractor hereunder shall be furnished in sufficient time to enable Subcontractor to perform and complete its Work within the time or times provided for herein. The time of performance of the Work by Subcontractor is of the essence, and Subcontractor agrees to reimburse Contractor for any and all liquidated or actual damages that may be assessed by Owner against Contractor which are attributable to or caused by Subcontractor's failure to perform the Work required by this Subcontract within the time fixed or in the manner provided for herein. Subcontractor also agrees to pay to Contractor any increased costs or other damages Contractor may sustain by reason of delay by Subcontractor, whether or not liquidated or actual damages are assessed by Owner. The payment of such damages shall not release Subcontractor from its obligation to otherwise fully perform this Subcontract. Upon written request by Contractor, Subcontractor shall furnish to Contractor such evidence as Contractor may require relating to Subcontractor's ability to fully perform this Subcontract in the manner and within the time specified herein.

(b) In the event Subcontractor fails to comply or becomes disabled from complying with the provisions herein as to character or time of performance, including but not limited to payment for all materials furnished and Work and labor performed under this Subcontract, and the failure is not corrected within five (5) calendar days after written request by Contractor to Subcontractor, Contractor may without prejudice to any other right or remedy, terminate this Subcontract for default and complete the performance of this Subcontract, by further subcontract or otherwise, at the expense of Subcontractor.

(c) As an alternative to terminating the Subcontract as provided in Subsection 6(b) above, and upon 48 hours written notice, Contractor may take over the Work or any portion thereof and furnish such materials and/or employ such workers as may be necessary to remedy the situation at the expense of Subcontractor. It is specifically agreed that Contractor may, in addition to any other rights it may have under this Subsection 6(c) or under Subsection 6(b) above, take possession of the premises and of all materials, tools and equipment of Subcontractor at the Project site for the purpose of performing such Work.

(d) Subcontractor shall keep on the Project site, during the progress of the Work, a competent superintendent who shall be the authorized representative of Subcontractor. Directions and communications to the superintendent from Contractor in connection with the Work shall be treated as directions and communication to Subcontractor.

(e) It is recognized that if Subcontractor becomes insolvent, or institutes or has instituted against it bankruptcy proceedings, or makes a general assignment for the benefit of creditors, or if a receiver is appointed for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, such event or events could impair or frustrate Subcontractor's performance of this Subcontract. Accordingly, it is agreed that upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its receiver or court-appointed successor adequate assurances of future performance. Pending receipt of adequate assurances of performance and actual performance in accordance therewith, Contractor shall be entitled to take over the Work pursuant to the provisions of Subsection 6(c) above following notice to Subcontractor.

(f) Subcontractor agrees that Contractor may, on five (5) calendar days written notice to Subcontractor, terminate this Subcontract in whole or in part for Contractor's convenience. Subcontractor's remedy for termination for convenience is limited to the following: (1) Subcontractor shall be entitled to be paid pursuant to the prices set forth herein for all Work properly performed prior to termination; (2) Partial payment shall be made for lump sum items of work on the basis of the percent complete of such items at the time of termination; and (3) Subcontractor shall be reimbursed for reasonable close-out costs. Subcontractor shall not be entitled to any compensation for loss of anticipated profits or unallocated overhead, nor shall Contractor be liable to Subcontractor for consequential damages, whether under this Section or otherwise arising out of or related to this Subcontract.

(g) If the Prime Contract, or any portion thereof that includes Subcontractor's scope of work, is terminated for the convenience of Owner, Subcontractor's remedy for termination shall be as set forth in the Prime Contract, and Subcontractor shall not be entitled to receive any greater amount than Contractor recovers from Owner on behalf of Subcontractor for such termination.

(h) Upon a determination by a court of competent jurisdiction that termination of Subcontractor or its successor in interest pursuant to any provision of this Subcontract was wrongful, such termination will be deemed converted to a termination for convenience and the Subcontractor's remedies shall be limited to those set forth in Subsection 6(f).

**Section 7. DELAYS.** (a) In the event Subcontractor's Performance of this Subcontract is delayed or interfered with by acts of Owner, Contractor or other subcontractors, or by other events for which Subcontractor is entitled to a time extension under the terms of the Prime Contract, Subcontractor may request an extension of the time for the performance of same, as hereinafter provided, but shall not be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such delay or interference, except to the extent that the Prime Contract entitles Contractor to compensation for such delay, and then only to the extent of any amounts that Contractor may, on behalf of Subcontractor, recover from Owner for such delay.

(b) No allowance for an extension of time for any cause whatsoever shall be claimed by, or granted to, Subcontractor unless Subcontractor shall have made written request upon Contractor for such extension within forty-eight (48) hours after the event giving rise to such request or, if the Prime Contract provides for a shorter period, within sufficient time to permit Contractor to give notice to Owner within the time allowed by the Prime Contract for such notice.

(c) No allowance of an extension of time shall, in any event, be made to Subcontractor for delay by Subcontractor in preparing drawings or in securing approval of Owner thereto when such drawings are not properly prepared or when Subcontractor, by the exercise of reasonable diligence and judgment, could have anticipated and avoided the delay.

**Section 8. LABOR.** Subcontractor, in connection with all Work covered by this Subcontract, shall comply with and be bound by any labor agreements executed by Contractor or on Contractor's behalf. Failure at any time to comply with any of the provisions of such agreements will, at the option of Contractor, be cause for immediate termination of this Subcontract for default, and Contractor shall have all of the rights contained in Section 6 with regard to such termination. If, by reason of strikes, picketing or disputes of any nature between Subcontractor and any individual, group or organization, Subcontractor should be persistently, repeatedly, or for a period of five (5) consecutive days, unable to supply enough properly skilled workers or proper materials to execute the Work defined in this Subcontract, Contractor may terminate Subcontractor for default and proceed in accordance with Section 6 hereof.

**Section 9. APPROVALS.** All drawings of Subcontractor shall be submitted through Contractor for approval of Owner, and all other communications between Subcontractor and Owner with respect to the Work shall be transmitted through Contractor.

**Section 10. INSURANCE.** Prior to commencement of Work, Subcontractor shall procure, and at all times thereafter maintain with insurers acceptable to Contractor, the following minimum insurance protecting Subcontractor, Contractor and Owner against liability from damages because of injuries, including death, suffered by persons, including employees of Subcontractor, and liability from damages to property arising from and flowing out of Subcontractor's operations, including its subcontractors' and suppliers' operations, in connection with the performance of this Subcontract. If the terms of the Prime Contract require larger limits or additional coverage or both, Contractor reserves the right to require Subcontractor to provide, at Subcontractor's expense, such larger limits or additional coverage or both.

(a) Workers' Compensation in statutory limits as prescribed by applicable law where the work is being performed, and Employers' Liability in the minimum amount of $100,000 each accident. Where applicable, coverage to include U. S. Longshoreman and Harbor Workers' Compensation Act, Outer Continental Shelf Lands Act and the Jones Act.

(b) Commercial General Liability including the following coverage extensions: (1) Contractual Liability, (2) Products/Completed Operations, (3) as applicable, coverage for Explosion, Collapse and Underground hazards, (4) Broad Form Property Damage and (5) Independent Contractors. limits of liability for such insurance shall be not less than $1,000,000 each occurrence and $1,000,000 general aggregate.

(c) Automobile Liability extending to owned, non-owned and hired automobiles used in the performance of the work. The limits of liability ...t less than $1,000,000 combined sir... limit.



Subcontractor shall provide Contractor with certificates evidencing such insurance as outlined above prior to beginning any Work under this Subcontract. Such certificates shall provide for thirty (30) days advance written notice to Contractor of cancellation, material change, reduction of coverage or non-renewal. Subcontractor shall cause its subcontractor(s) to procure insurance as outlined above. Subcontractor shall obtain policies or certificates for its subcontractor(s) and deliver them to Contractor, if requested to do so. Subcontractor's insurance shall be regarded as primary insurance to any other applicable insurance maintained by Contractor or Owner.

**Section 11. INDEMNIFICATION.** To the fullest extent permitted by law, Subcontractor specifically obligates itself to Contractor, Contractor's surety, Owner and any other party required to be indemnified under the Prime Contract, jointly and severally, in the following respects, to-wit:

(a) To defend and indemnify them against and save them harmless from any and all claims, suits, liability, expense or damage for any alleged or actual infringement or violation of any patent or patented right, arising in connection with this Subcontract and anything done thereunder.

(b) To defend and indemnify them against and save them harmless from any and all claims, suits or liability for damages to property including loss of use thereof, injuries to persons, including death, and from any other claims, suits or liability on account of acts or omissions of Subcontractor, or any of its subcontractors, suppliers, officers, agents, employees or servants, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided however, Subcontractor's duty hereunder shall not arise if such claims, suits or liability, injuries or death or other claims or suits are caused by the sole negligence of Contractor, unless otherwise provided in the Prime Contract. Subcontractor's obligation hereunder shall not be limited by the provisions of any Workers' Compensation act or similar statute.

(c) To pay for all materials furnished and Work and labor performed under this Subcontract, and to satisfy Contractor thereupon whenever demand is made, and to defend and indemnify them against and save them and the premises harmless from any and all claims, suits or liens therefor by others than Subcontractor.

(d) To obtain and pay for all permits, licenses and official inspections necessary for its Work, and to comply with all laws, ordinances and regulations bearing on the Work and the conduct thereof.

(e) To warrant and guarantee the Work covered by this Subcontract, and to make good, at its own expense, any defect in materials or workmanship which may occur or develop prior to Contractor's release from responsibility to Owner therefor.

(f) To assume toward Contractor all obligations and responsibilities that Contractor assumes toward Owner and others, as set forth in the Prime Contract, insofar as applicable, generally or specifically, to Subcontractor's Work.

To the fullest extent permitted by law, Subcontractor shall defend and indemnify Contractor, Contractor's surety, Owner and other indemnified parties against, and save them harmless from, any and all loss, damage, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract. Notwithstanding the above, Contractor at its sole discretion reserves the right to defend any one or all of the following: Owner, other indemnified parties, Contractor's surety and itself. Such election to defend by Contractor shall not in any way limit Subcontractor's responsibility to indemnify and hold harmless as provided herein.

**Section 12. LIENS AND CLAIMS.** Subcontractor shall, as and when requested, furnish evidence satisfactory to Contractor and Owner that all amounts due for labor and material furnished Subcontractor in connection with performance of this Subcontract have been paid, including union health, welfare and pension fund payments and payroll taxes. Such evidence shall be furnished in such form and manner as requested by Contractor, and all statements relative thereto shall, if called for by Contractor, be made by sworn affidavit. Subcontractor shall furnish to Contractor releases of bond rights and lien rights by persons who have furnished labor, material or other things in the performance of this Subcontract, it being agreed that payment of money otherwise due Subcontractor need not be made by Contractor until such releases are furnished. Subcontractor shall deliver its Work free from all claims, encumbrances and liens. If the Prime Contract requires that Contractor waive its right to place liens on the Project or any part thereof, Subcontractor hereby waives its right to place liens on the Project and will cause its suppliers, materialmen, mechanics and subcontractors to waive their right to place liens on the Project.

**Section 13. POSSESSION PRIOR TO COMPLETION.** Whenever it may be useful or necessary for Contractor to do so, Contractor shall be permitted to occupy and/or use any portion of the Work which has been either partially or fully completed by Subcontractor before final inspection and acceptance thereof by Owner, but such use and/or occupation shall not relieve Subcontractor of its guarantee of said Work, nor of its obligation to make good at its own expense any defect in materials and/or workmanship which may occur or develop prior to Contractor's release from responsibility to Owner.

**Section 14. OTHER CONTRACTS.** It is understood and agreed that the Work provided for in this Subcontract constitutes only a part of the work being performed for Owner by Contractor and other subcontractors. Subcontractor, therefore, agrees to perform the Work in such a manner that it will not injure, damage or delay any other Work performed by Contractor or any other subcontractor or supplier, and further agrees to pay or reimburse Contractor for any additional costs, damage or delay that may be caused to such other work of Contractor, subcontractors or suppliers by Subcontractor or by its agents or employees.

**Section 15. INDEPENDENT CONTRACTOR.** Subcontractor specifically agrees that it now is, and will remain during the performance of this Subcontract, an independent contractor.

**Section 16. COMPLIANCE WITH LAW.** Subcontractor agrees to fully comply with all applicable laws, ordinances and regulations.

**Section 17. SAFETY.** Subcontractor shall take all reasonable safety precautions pertaining to its Work and the conduct thereof. Without limiting the generality of the foregoing, it shall comply with all applicable laws, ordinances, rules, regulations and orders issued by any public or governmental body or authority, whether federal or otherwise, including, but not limited to, occupational safety and health legislation and, in addition, the safety measures called for by Contractor.

**Section 18. PROTECTION OF WORK.** Subcontractor specifically agrees that it is responsible for the protection of its Work until final completion and acceptance thereof by Owner, and that Subcontractor will make good or replace, at no expense to Contractor or Owner, any damage of its Work which occurs prior to said final acceptance.

**Section 19. DISPUTES.** (a) In the event of any request or claim by Subcontractor seeking additional time or compensation which arises out of or is related to the acts or omissions of the Owner, changes to or defects in the Prime Contract, or any other claim for which the Owner may have responsibility, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner, both by the terms of the Prime Contract and by any and all decisions or determinations made thereunder by the party, board or court as authorized in the Prime Contract for resolving such claims. In the event the Prime Contract contains a provision, hereinafter called a "Disputes" clause, specifying a procedure for resolving claims, then Contractor agrees to invoke, at Subcontractor's request, such Disputes clause on behalf of Subcontractor, and to allow Subcontractor to present such claims to Owner in Contractor's name, provided Subcontractor cooperates fully with Contractor in the presentation of such claims. Subcontractor shall have full responsibility for the preparation and presentation of its claims, including timely notice to allow Contractor to comply with the terms of the Prime Contract, and shall bear all expense related thereto, including attorneys' fees. Subcontractor agr

to be bound by any final determination as rendered on its claim, whether pursuant to any such Disputes clause or otherwise, and Subcontractor shall in no event be entitled to receive any greater amount from Contractor than Contractor is entitled to and actually does receive from Owner on account of Subcontractor's claims, less any markups or costs incurred by Contractor and to which Contractor is otherwise entitled, and Subcontractor agrees that it will accept such amount, if any, received by Contractor from Owner as full satisfaction and discharge of such claims. Subcontractor agrees that it will not take any other action with respect to any such claims. In the event Subcontractor is not diligent in the pursuit of its claims, or otherwise refuses to cooperate with Contractor as provided herein, then in its sole discretion Contractor may consider such claims to be waived by Subcontractor, or may prepare and present such claims on behalf of Subcontractor.

(b) In the event Owner requires Contractor to certify Subcontractor's claim, Subcontractor shall prepare and certify to Contractor any such claim in accordance with the requirements of the Owner and the Prime Contract. Subcontractor hereby agrees to defend and indemnify Contractor and save Contractor harmless from any and all liability arising out of or related to such Subcontractor claims and any certification furnished thereon.

(c) Subcontractor shall be bound by Contractor's determination, made in good faith, as to apportionment of any amounts received by Contractor from Owner on behalf of Subcontractor and other claimants, including Contractor, whose work is affected by any act or omission of the Owner.

(d) Should a dispute arise as to the proper interpretation of this Subcontract, or as to the acceptability of Work or material performed or furnished hereunder, which concerns the parties hereto only, or Subcontractor and other subcontractors or suppliers, but not Owner, the same shall be decided by Contractor whose decision thereon shall be final and binding.

(e) Subcontractor shall proceed diligently with the Work, pending final determination pursuant to any Disputes clause or pursuant to any other action taken with respect to any claims.

**Section 20. ATTORNEY FEES.** In the event either party institutes suit in court against the other party or against the surety of such party, in connection with any disputed matter arising under this Subcontract, the prevailing party shall be entitled to recover all costs, expenses and attorney fees in addition to any other relief granted by the court. Subcontractor further agrees to waive any right to trial by jury in any dispute between Contractor and Subcontractor.

**Section 21. TAXES.** Subcontractor shall pay all taxes, licenses and fees of every nature which may be imposed or charged by any governmental authority upon the labor, material, or other things used in the performance of the Work or upon the transaction between Contractor and Subcontractor.

**Section 22. CONTRACTOR'S EQUIPMENT.** In the event that Subcontractor, by rental, loan or otherwise, makes use of any of Contractor's equipment, scaffolding, or other appliances, Subcontractor agrees to accept such "as is", and further agrees that such use shall be at the sole risk of Subcontractor. Subcontractor agrees to defend, indemnify and hold Contractor harmless against all claims of every nature arising from its use thereof.

**Section 23. FURNISHED MATERIAL.** In the event that Contractor or Owner, or their suppliers or subcontractors, elect to furnish material to Subcontractor for use in connection with this Subcontract, then the cost of handling, storing and installing such material shall be considered as included in the Subcontract price. Subcontractor shall be responsible for all such materials upon delivery to it, whether delivered F.O.B. point of origin or F.O.B. job-site (except that any transportation charges paid by Subcontractor, in the event of delivery F.O.B. point of origin, shall be reimbursed to Subcontractor), and Subcontractor shall pay all demurrage and storage charges which accrue after delivery. Furnished material lost or damaged after delivery, from any cause whatsoever, shall be replaced by or at the expense of Subcontractor. Subcontractor shall, within forty-eight (48) hours after delivery of furnished material, inspect the same and immediately report in writing to Contractor any shortages, damages or defects therein which are reasonably observable by proper inspection. Failure to inspect and report as specified shall be treated as unqualified acceptance by Subcontractor of the material involved.

**Section 24. EQUAL OPPORTUNITY.** If the Prime Contract contains any provision which prohibits discrimination on the basis of race, color, religion sex, or national origin, or if any law, regulation or order has any application thereto and is applicable to this Subcontract, then Subcontractor hereby agrees to comply with such provision, law, regulation or order. In the event that any such provision, law, regulation or order requires the physical attachment of specific wording to this Subcontract, then such attachment shall be furnished by Contractor and shall be considered a part of this Subcontract by reference thereto or shall be physically attached thereto as called for by Contractor.

**Section 25. OWNER'S REPRESENTATIVE.** The term "Owner" as used herein shall include the Owner's Representative, its design engineer, architect or any person or entity appointed by Owner to supervise the work of Contractor on behalf of Owner.

**Section 26. ASSIGNMENT.** Subcontractor shall obtain the written consent of Contractor prior to assigning or subletting any of the Work, in whole or in part. Subcontractor may assign the proceeds of the Work after providing adequate assurances to Contractor that all its laborers, suppliers and other creditors for the Work will be paid, and upon obtaining the consent of Subcontractor's surety and the acknowledgment of the assignee on forms provided by Contractor.

***Section 27. PRIOR UNDERSTANDINGS OR REPRESENTATIONS.*** Contractor assumes no responsibility for any understandings or representations made by any of its officers or agents prior to the execution of this Subcontract, unless such understandings or representations by Contractor are expressly set forth in this Subcontract. Unless specifically referenced herein and attached hereto, no proposals or terms of any nature submitted by Subcontractor prior to the execution of this Subcontract shall be of any effect.

**Section 28. SEVERABILITY AND WAIVER.** The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision. The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

**Section 29. CAPTIONS.** The captions at the beginning of each Section are for convenience only and are to be given no weight in construing the provisions of this Subcontract.

**Section 30. NOTICES.** All notices shall be in writing addressed to the parties at the addresses set out in this Subcontract unless subsequently changed in conformance with this notice provision, and shall be considered as delivered on the third business day after the date of mailing if sent certified mail or when received in all other cases, including telecopy or other printed electronic medium or personal delivery.

Job Name: H-J Apron / Job No. 44-1715
Project No. B315A

Subcontractor: Fisk Electric Company
Subcontract Date: December 13, 2002

Article 3 ( Continued ) – ADDITIONAL PROVISIONS

A. **SUBCONTRACTOR APPROVAL:** The Subcontractor is responsible for obtaining and retaining Owner approval of its participation in the project. The Contractor has the right to terminate the Subcontract under Section 6, if approval is not obtained.

Subcontractor must have and maintain any necessary licenses, permits, or registrations required by state, local, and county governments to perform work in the State of Florida. Subcontractor shall hold valid current Miami-Dade Certificates of Competency and/or State Licenses as applicable for the type of work to be performed, in accordance with the qualification requirements as set forth in Chapter 489 of the Florida Statutes and Chapter 10 of the Code.

B. **REQUIRED CONTRACT PROVISIONS:** The following documents are incorporated into this Subcontract hereto and shall be complied with as required. (However, if any of the provisions, as amended, are less restrictive than Florida State Law, then the Florida State Law shall prevail.)

| | | | |
|---|---|---|---|
| 1. | Attachment 1 | Section 1→ Section 8 | Contractor Controlled Insurance Program (CCIP) |
| 2. | Attachment 2 | GC 29 → GC 48 | Miscellaneous Provisions |
| 3. | Attachment 3 | GC 69 → GC 74 | Indemnification and Hold Harmless |
| 4. | Attachment 4 | Article 14 | Subcontractors Guarantee Forms and Affidavits |
| 5. | Attachment 5 | Section 12 | Safety Program |
| 6. | Attachment 6 | BF 4 → BF 4WW | Wage Rates |
| 7. | Attachment 7 | 12 Pages | Procedures for Contractor Registering at MIA & Obtaining Airport ID Badges |

C. **SUBCONTRACT PROVISIONS:** Without limiting the incorporation of all terms of the prime contract as provided in Section 1 of the Subcontract, certain provisions are outlined below for emphasis and clarity.

D. **CORRESPONDENCE:** Subcontractor will route all correspondence with the Owner through the Contractor.

E. **CERTIFICATIONS:** the following shall be executed and submitted to the Contractor with the executed Subcontract:

1. Subcontractor's EEO policy, signed by Owner or President of Company:
2. Subcontractor's Affirmative Action Policy, signed by Owner or President of Company.
3. Designation of company EEO/AA officer, signed by Owner or President of Company.
4. Reports of EEO meetings with supervisory and personnel office employees
   a) Prior to start of construction
   b) Every two (2) months thereafter
5. Monthly report for first three (3) months of construction, and thereafter upon request, indicating the number of minority and non-minority group employees currently engaged on each work classification required by the work.
6. Monthly summary of Wage Rates

F. **SAFETY:** The Subcontractor's obligations pursuant to Attachment 5 and Section 17, "Safety", include but are not limited to:

Gilbert Southern Corp.

Fisk Electric Company

**Job Name: H-J Apron / Job No. 44-1715**
**Project No. B315A**

**Subcontractor: Fisk Electric Company**
**Subcontract Date: December 13, 2002**

**Article 3 ( Continued ) – ADDITIONAL PROVISIONS**

1. Ensure that all employees will have all required personal equipment including but not limited to hard hats, work boots, work gloves, safety glasses, long pants, sleeved shirts, and hearing protection as required.
2. Supervise the mandatory use by all employees at all times of all required personal protective equipment.
3. Compliance with Employee Hazard Communications Program (Right to Know Laws).
4. Subcontractor agrees to establish and implement a Hazard Communication Program. This includes, but is not limited to, furnishing material safety data sheets to the Contractor upon receipt and implementing a training program for jobsite employees.
5. The Subcontractor shall comply with all applicable laws and ordinances, rules, regulations and orders issued by any public or government body or authority, whether federal or otherwise, and measures called for by the Contractor.
6. Mandatory attendance of the Subcontractors on-site supervisor(s) at a Subcontractor Safety Meeting with the Contractor and Owners representatives to be held prior to commencement of work.
7. Safety Indoctrination of all employees before commencing work and performing weekly safety meetings with crews, including maintaining the required documentation of the same.
8. Full compliance with the safety provisions of all contract documents and cooperation with Contractors and Owners Safety Representatives.
9. Providing operational back-up alarms on all equipment and trucks to be used on the jobsite.
10. A competent person and training for its personnel pursuant to the Florida Trench Safety Act and OSHA's Rules and Regulations as necessary and for all confined space needs.
11. Provide marking and protection of all open excavations and fall hazards daily.
12. Compliance with Project Utility Locate and Pothole Plan.

G. **AOA OPERATIONS**: The Subcontractor shall obtain and be responsible for all employee identification badges and ramp passes for all vehicles prior to the beginning work on the project. No one is permitted on the job site without proper identification badges and vehicle ramp passes. The subcontractor shall provide transportation for its personnel to and from the site. All deliveries to the jobsite shall be coordinated through subcontractor by submitting, via hand delivery, a completed Airside Operations Advance Notification Request Form (See Attachment 7) 24 hours in advance of the delivery date.

H. **PROJECT CLEANUP**: The work area used by the Subcontractor shall be approved by the Contractor and are to be maintained in a clean and safe working condition. The following rules are to be strictly adhered to:

1. All materials brought to the job site shall be placed in an area designated by the Contractor, in orderly manner, including provisions for ingress and egress at all times.
2. All debris must be removed from working area daily and from job site weekly or as directed by Contractor.
3. Compliance with all relevant Federal, State, County and City fire and safety regulations.
4. Equipment, especially concrete or asphalt trucks, shall not be washed or cleaned –out on the project except in areas where unused product can be prevented from entering waterways. The Owner, Contractor, and/or applicable Regulatory Agency shall approve these areas.

Should the Subcontractor fail to comply with the above requirements the contractor may perform these functions, with his own crew, for the account of the Subcontractor.

Gilbert Southern Corp.

Fisk Electric Company

**Job Name: H-J Apron / Job No. 44-1715**
**Project No. B315A**

**Subcontractor: Fisk Electric Company**
**Subcontract Date: December 13, 2002**

**Article 3 ( Continued ) – ADDITIONAL PROVISIONS**

I. **PROJECT CLOSEOUT DOCUMENTS:** All drawings, manuals and/or maintenance manuals that are required by the Contract Specifications must be furnished prior to the Contractor's release of the retained percentage and /or final payment.

J. **WEEKLY MEETINGS:** The Subcontractor's job site representative may be required to attend weekly safety and/or schedule meetings. He or she will be advised of the time and place of the meeting by the Contractor.

K. **INSURANCE:** Without limiting the generality of Section 10 of the General Provisions, such coverage shall include: A policy endorsed to include the Miami-Dade County Aviation Department, Parsons-Odebrecht, Joint Venture and Gilbert Southern Corp. named as additional insured.

The Owner is providing some insurances for the project as provided in the contract documents. The Subcontractor is obligated to immediately notify the Contractor and Owner in case of an accident or occurrence of concern within 24 hours of occurrence.

The insurance limits of Section 10, "Insurance" are modified as follows: (Reference Article 12. Insurance of the prime contract)

1. Worker's Compensation, as required by Chapter 440, Florida Statutes

2. Automobile Liability, all owned, non-owned and hired vehicles used in connection with the work in an amount not less than $1,000,000 combined single limit for bodily injury and property damage liability.

3. Property Damage Liability, covering damage to property caused by Subcontractor in an amount not to exceed $15,000 for each claim. In addition to the limit, coverage shall be provided for all claim adjustment expense, legal cost and attorney's fees in connection with the handling of each claim.

L. **INCIDENTIALS:** Subcontractor is responsible for all incidentals necessary to perform its work, including but not limited to the following:

1. Providing an onsite supervisor capable of communicating with the Contractor and Owners representative during all hours of work.
2. Coordination of its work with others.
3. Trash removal and daily clean up of the Subcontractors work area to a central location.
4. Safety and first aid equipment and facilities.
5. Site security measures to the extend necessary to protect its own materials, equipment and work as well as the general public.
6. Temporary utilities if required.
7. Temporary access and storage areas.
8. Temporary office, phones, etc. if required.
9. Utility locates.
10. Support equipment and lighting, only as required for the Subcontractors work.
11. Foreign object debris control.
12. Schedule and coordination for all escorts.

Gilbert Southern Corp.

Fisk Electric Company

**Job Name: H-J Apron / Job No. 44-1715**
**Project No. B315A**

**Subcontractor: Fisk Electric Company**
**Subcontract Date: December 13, 2002**

**Article 3 ( Continued ) – ADDITIONAL PROVISIONS**

13. The Subcontractor shall restore any existing facilities that are damaged and/or removed by Subcontractor during performance of its work that is not paid for by the Owner under existing unit price bid items.
14. Cleaning of all surfaces\facilities necessary to perform the work and or turn over to the Contractor and Owner.

**N. REPORTING**: In addition to any other provisions of this subcontract, it is required that the subcontractor shall make timely submissions to the contractor of the following:

1. Certified payrolls (one original and two copies) are to submitted weekly for all labor performed on contract related work.
2. Daily construction report.
3. Required submittals on a timely basis so as not effect project progress.
4. Scheduling and production information required by Contractor. Subcontractor shall schedule all work with the Contractor with a minimum one-week notice. When requested by Contractor, Subcontractor shall submit three-week look ahead schedules on a weekly basis.

**O. SUBMISSIONS**: The Subcontractor should prepare and submit to the Contractor the following submissions within the same time frames indicated or so as not delay work, whichever is earliest:

1. A detailed Schedule of Values indicating installed values of each major item of work and each subcontracted item of work as a separate line item to serve as a basis for computing values for progress payments. The Preliminary Schedule of Values is due within 14 days from receipt of this agreement.
2. Listing of all submittals required for the work within 14 days from receipt of this agreement.
3. Submittals as required or requested for the work including but not limited to shop drawings, data sheets, product information, certifications, test reports, samples, manuals, surveys, warranties and schedules within 30 days from receipt of this agreement.
4. Twelve (12) original copies of each submittal shall be provided.
5. Schedule of work, including duration for each construction activity agreeable to Contractor, submittal dates and long lead purchased items, quantity of work for each activity agreeable to contractor, submittal dates an long lead purchased item, quantity of work for each activity and its associated production rate and manpower activity within 14 days from receipt of this agreement.
6. Certificates of insurance within 14 days from receipt of this agreement.
7. Tabulation of work completed the 3rd Sunday of the month. This requirement may be adjusted to meet owner's requirements.

**P. PAYMENT**: Partial payments shall be made per Article 10 of the General Conditions. The Subcontractor shall submit to the contractor prior to each month's progress payment request the following:

1. Monthly Progress Report detailing all work performed with quantity backup, if applicable.
2. Subcontractor's Affidavit and Release of Claim per General Conditions.
3. Certified Payrolls
4. "In-progress" as-built drawings and information as the Owner may require to document quantities.

The amount of such payment shall be the total value of the work done to the date of the estimate, based on the quantities and contact unit prices, less an amount retained and less payments previously made.

Gilbert Southern Corp.

Fisk Electric Company

**Article 3 ( Continued ) – ADDITIONAL PROVISIONS**

Affidavit, final release, lien waiver, indemnity documents, all certified payrolls and close- out submittals are required prior to final payment and release of retainage to Subcontractor.

The Subcontractor's payments shall be withheld until all County, State, Federal, and other required documentation are received and approved by the Owner.

The price in Article 1 includes all taxes, mobilization, and necessary insurance to perform the work; and all shop drawings, color samples, work plans or any other applicable deliverables required by the specifications.

Price in Article 1 includes compliance with all County, State, Federal, Local and OSHA regulations to perform the work. Per Article 7 of the General Conditions work performed by Subcontractor which includes, but is not limited to the removal and disposal of hazardous materials generated by Subcontractor.

**Q. DRUG FREE WORKPLACE**: The Subcontractor, agrees to abide by the Florida statute 287 .087 and to comply with all requirements concerning the provisions of a drug –free work place.

**R. BOND**: The Price in Article 2 includes the cost of the Performance and Payment Bond.

**S. SCOPE SPECIFIC ADDITIONAL PROVISIONS:**

1. Whenever possible, Subcontractor shall perform work during normal business hours, Monday through Friday, 7:00 AM to 3:30 PM. However, when required by the Prime Contract, Subcontractor shall perform work during night and/or weekend hours so as not to hinder the overall progress of the project.
2. Subcontractor shall obtain all electrical permits required for the job. All permit fees shall be paid by MDAD.
3. Subcontractor excludes any and all fees required for utility and/or governmental agencies, including any charges related to the cost of permanent or temporary service installations.
4. The Contractor shall provide all housekeeping and/or equipment pads including any required block-outs and/or sleeves.
5. Subcontractor includes in the price of Article 2, the costs to furnish and install temporary 200 amp – 120/208 volt electrical services to the Contractors field office trailer and maintenance yard. The total value of the temporary work included shall not exceed $11,780.00. Subcontractor shall not be required to provide any other temporary power services.
6. Subcontractor includes all excavation, concrete encasement and backfill required for electrical installation.
7. Subcontractor excludes all patching and/or restoration of existing surfaces.
8. Subcontractor excludes all cutting, removal and disposal of concrete, asphalt and existing utilities.
9. Subcontractor shall leave any excess soil on site for the Contractor to handle.
10. Subcontractor excludes the removal, transport and disposal of any hazardous or contaminated material.
11. Subcontractor shall be responsible to ensure that all trenching work is performed in accordance with OSHA safety rules. Contractor acknowledges, if through no fault of the Subcontractor, that sheetpiling or mechanical shoring is required, this shoring shall be installed and removed by the Contractor.
12. Subcontractor shall be responsible to manipulate groundwater in their trenches or excavations to facilitate their underground work. If pumping and/or treatment of groundwater is required, this shall be performed by the Contractor. The Subcontractor shall work continuously to complete work in any dewatered trenches and/or excavations so as to minimize the amount of pumping.

Gilbert Southern Corp.

Fisk Electric Company





**Article 3 ( Continued ) – ADDITIONAL PROVISIONS**

13. The adjustment of all existing electrical and communication structures to proposed grade shall be performed by the Contractor.
14. Electrical motors, starters and control panels required for mechanical systems shall be furnished and installed by the Contractor or his designated mechanical subcontractor. The Subcontractor shall electrically connect this equipment.
15. Access panels required to be cast into slabs, walls and/or other surfaces shall be furnished by the Subcontractor and installed by the Contractor.
16. Subcontractor includes all necessary materials and installation for the Emergency Fuel Shut-off system, the Leak Detection system and the Cathodic Protection system.
17. Subcontractor shall disconnect and make safe all buildings and items to be demolished or salvaged. Subcontractor shall also dismantle electrical equipment to be salvaged so as to facilitate transportation.
18. Contractor shall furnish and install all manholes. Subcontractor shall perform all ductbank tie-ins. Subcontractor shall furnish and install grounding and cable racks as required for the manholes.
19. All provisions of this subcontract not withstanding, the Subcontractor shall ensure that their work is closely coordinated with other trades so as to promote the progress of the overall project.

**END OF ARTICLE**

Gilbert Southern Corp.

Fisk Electric Company

# Exhibit 2

BOND NO. 41SB103962878BCM

## PAYMENT BOND

By this Bond, We Gilbert Southern Corp. , as Principal, whose principal business address is 1011 Shotgun Rd, Sunrise, FL 33326, as Trade Contractor under the contract dated ___________, 2001, between Principal and Parsons-Odebrecht, J. V., a Joint Venture ("POJV" or "Construction Manager"), for the construction of MIA South Terminal Expansion Program, Project No. B315A (herein referred to as "Trade Contract") the terms of which Trade Contract are incorporated into this Bond and Travelers Casualty and Surety Company of America, a corporation, whose principal business address is One Tower Square-13CZ, Hartford, CT 06183, as Surety, are held and firmly bound to POJV as obligee, in the sum of Forty Seven Million Four Hundred Seventy Two Thousand Three Hundred Sixty One 00/100-- (US dollars) $ 47,472,361.00-- for payment of which we bind ourselves, our heirs, personal representatives, successors, and assigns, jointly and severally.

THE CONDITION OF THIS BOND is that if Principal:

1. Promptly makes payments to all claimants as defined in Section 255.05(1), Florida Statutes, supplying Principal with labor, material, or supplies used directly or indirectly by Principal in the prosecution of the work provided in the Trade Contract which is made a part of this bond by reference, and in the times and in the manner prescribed in the Trade Contract; and

2. Pays POJV, all loss, damage, expenses, costs, and attorney's fees, including appellate proceedings, that POJV sustains because of a failure by Principal to make such payments;

Then this bond is void; otherwise, it remains in full force.

A claimant shall have a right of action against the Principal and the Surety for the monies due it. Such action shall not involve POJV in any expense.

A claimant, except a laborer, who is not in privity with the Principal and who has not received payment for labor, materials, or supplies shall, within 45 days after beginning to furnish labor, materials or supplies for the prosecution of the work, furnish the Principal with a notice that it intends to look to the bond for protection. A claimant who is not in privity with the Principal and who has not received payment for labor, materials, or supplies shall, within 90 days after performance of the labor or after delivery of the materials or supplies, deliver to the Principal and to the Surety written notice of the performance of the labor or delivery of the materials or supplies and of the nonpayment.

No action for labor, materials or supplies may be instituted against the Principal or the Surety unless both notices have been given. No action shall be instituted against the Principal or the Surety on the bond after one (1) year from the performance of the labor or completion of the delivery of the materials or supplies. A claimant may not waive in advance its right to bring an action under the bond against the Surety.

Any changes in or under the Trade Contract Documents and compliance or noncompliance with formalities connected with the Trade Contract or with the changes do not affect Surety's obligations under this Bond.

**PAYMENT BOND**

IN WITNESS WHEREOF, the above bounden parties have caused this Bond to be executed by their appropriate officials as of the 10 day of December 2002.

Witness [signature]

TRADE CONTRACTOR:

By: [signature]

Name: David J. Miles

Title: President

SURETY:

By: [signature]

Name: Jennifer L. Miller

Title: Attorney-in-Fact

Corporate Seal

[signature]

COUNTERSIGNED BY RESIDENT

FLORIDA AGENT OF SURETY

*(Copy of Agent's current identification card as issued by the State of Florida Insurance Commissioner must be attached)*

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA
TRA''''LERS CASUALTY AND SURETY COMPANY
.RMINGTON CASUALTY COMPANY
Hartford, Connecticut 06183-9062

# POWER OF ATTORNEY AND CERTIFICATE OF AUTHORITY OF ATTORNEY(S)-IN-FACT

**KNOW ALL PERSONS BY THESE PRESENTS, THAT TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY** and **FARMINGTON CASUALTY COMPANY,** corporations duly organized under the laws of the State of Connecticut, and having their principal offices in the City of Hartford, County of Hartford, State of Connecticut, (hereinafter the "Companies") hath made, constituted and appointed, and do by these presents make, constitute and appoint: **Philip G. Dehn, Terry K. Bartel, Jennifer L. Miller, Janet R. Nielsen, Christopher W. Buresh, Tammy Pike,** of **Omaha, Nebraska,** their true and lawful Attorney(s)-in-Fact, with full power and authority hereby conferred to sign, execute and acknowledge, at any place within the United States, the following instrument(s): by his/her sole signature and act, any and all bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking and any and all consents incident thereto and to bind the Companies, thereby as fully and to the same extent as if the same were signed by the duly authorized officers of the Companies, and all the acts of said Attorney(s)-in-Fact, pursuant to the authority herein given, are hereby ratified and confirmed.

This appointment is made under and by authority of the following Standing Resolutions of said Companies, which Resolutions are now in full force and effect:

VOTED: That the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President, any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary may appoint Attorneys-in-Fact and Agents to act for and on behalf of the company and may give such appointee such authority as his or her certificate of authority may prescribe to sign with the Company's name and seal with the Company's seal bonds, recognizances, contracts of indemnity, and other writings obligatory in the nature of a bond, recognizance, or conditional undertaking, and any of said officers or the Board of Directors at any time may remove any such appointee and revoke the power given him or her.

VOTED: That the Chairman, the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President may delegate all or any part of the foregoing authority to one or more officers or employees of this Company, provided that each such delegation is in writing and a copy thereof is filed in the office of the Secretary.

VOTED: That any bond, recognizance, contract of indemnity, or writing obligatory in the nature of a bond, recognizance, or conditional undertaking shall be valid and binding upon the Company when (a) signed by the President, any Vice Chairman, any Executive Vice President, any Senior Vice President or any Vice President, any Second Vice President, the Treasurer, any Assistant Treasurer, the Corporate Secretary or any Assistant Secretary and duly attested and sealed with the Company's seal by a Secretary or Assistant Secretary, or (b) duly executed (under seal, if required) by one or more Attorneys-in-Fact and Agents pursuant to the power prescribed in his or her certificate or their certificates of authority or by one or more Company officers pursuant to a written delegation of authority.

**This Power of Attorney and Certificate of Authority is signed and sealed by facsimile (mechanical or printed) under and by authority of the following Standing Resolution voted by the Boards of Directors of TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY, which Resolution is now in full force and effect:**

VOTED: That the signature of each of the following officers: President, any Executive Vice President, any Senior Vice President, any Vice President, any Assistant Vice President, any Secretary, any Assistant Secretary, and the seal of the Company may be affixed by facsimile to any power of attorney or to any certificate relating thereto appointing Resident Vice Presidents, Resident Assistant Secretaries or Attorneys-in-Fact for purposes only of executing and attesting bonds and undertakings and other writings obligatory in the nature thereof, and any such power of attorney or certificate bearing such facsimile signature or facsimile seal shall be valid and binding upon the Company and any such power so executed and certified by such facsimile signature and facsimile seal shall be valid and binding upon the Company in the future with respect to any bond or undertaking to which it is attached.

(11-00 Standard)

IN WITNESS WHEREOF, TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY have caused this instrument to be signed by their **Senior Vice President** and their corporate seals to be hereto affixed this 11th day of July 2001.

STATE OF CONNECTICUT

}SS. Hartford

COUNTY OF HARTFORD










TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA
TRAVELERS CASUALTY AND SURETY COMPANY
FARMINGTON CASUALTY COMPANY

By ______________________

George W. Thompson
Senior Vice President

On this 11th day of July, 2001 before me personally came **GEORGE W. THOMPSON** to me known, who, being by me duly sworn, did depose and say: that he/she is **Senior Vice President** of **TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY**, the corporations described in and which executed the above instrument; that he/she knows the seals of said corporations; that the seals affixed to the said instrument are such corporate seals; and that he/she executed the said instrument on behalf of the corporations by authority of his/her office under the Standing Resolutions thereof.




Marie C Tetreault

My commission expires June 30, 2006 Notary Public
Marie C. Tetreault

CERTIFICATE

I, the undersigned, **Assistant** Secretary of **TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, TRAVELERS CASUALTY AND SURETY COMPANY and FARMINGTON CASUALTY COMPANY**, stock corporations of the State of Connecticut, DO HEREBY CERTIFY that the foregoing and attached Power of Attorney and Certificate of Authority remains in full force and has not been revoked; and furthermore, that the Standing Resolutions of the Boards of Directors, as set forth in the Certificate of Authority, are now in force.

Signed and Sealed at the Home Office of the Company, in the City of Hartford, State of Connecticut. Dated this 10 day of December , 2002.










By ______________________

Kori M. Johanson
Assistant Secretary, Bond

FLORIDA DEPARTMENT OF INSURANCE

DONALD JAMES DALSTROM

License Number A060700

IS LICENSED TO TRANSACT THE FOLLOWING CLASSES OF INSURANCE

General Lines (Prop & Casu)



RESIDENT LICENSE

This Licensee must have an active appointment with the insurer or employer for which products or services are being marketed. See reverse for additional requirements

# IMPORTANT PLEASE READ CAREFULLY

1. Licensee may only transact insurance with an active appointment by an eligible insurer or employer. If this person is acting as a surplus lines agent, public adjuster, reinsurance intermediary manager/broker or a health care risk manager, he/she should have an appointment recorded in their own name on file with the Department. If you are unsure of this licensee's status, you should contact the Florida Department of Insurance immediately.
2. This license will expire if more than 48 months elapse without an appointment for each class of insurance listed on the front. If such expiration occurs, the individual or firm will be required to re-qualify as a first-time applicant.

Donald J. Dalstrom

3. If this license was obtained by passing a licensure examination offered by the Florida Department of Insurance, the licensee is required to comply with continuing education requirements contained in 626.2815, 626.859, or 648.386 Florida Statutes.
4. THIS LICENSE IS THE PROPERTY OF THE FLORIDA DEPARTMENT OF INSURANCE. PLEASE NOTIFY THE DEPARTMENT IMMEDIATELY IF LOST OR STOLEN.

# Exhibit 3

OFF.REC.BK.

20883PG1608

02R788918 2002 DEC 18 11:38

**Bonded Public Work Project**
In compliance with F. S. CHAPTER 255.05(1Xa)

| Bond No.: | 085771771, 2863671 | | |
|---|---|---|---|
| Contractor: | Parsons-Odebrecht JV, A Joint Venture | | |
| Address: | 4450 N.W. 20th Street, Suite 100<br>Miami FL 33122 | | |
| Phone No.: | 305-341-8700 | | |
| Surety Company: | Fidelity and Deposit Company of Maryland | | |
| Address: | 3910 Keswick Road<br>Baltimore MD 21211 | | |
| Phone No.: | 847-605-6000 | FAX No.: | 410-261-7938 |
| Surety Company: | American Home Assurance Company | | |
| Address: | 70 Pine Street<br>New York NY 10270 | | |
| Phone No.: | 212-770-6480 | FAX No.: | 212-425-8170 |
| Owner: | Miami-Dade County | | |
| Address: | PO Box 592075<br>Miami FL 33159-2075 | | |
| Phone No.: | | | |
| Contracting Public Entity if Different from Owner: | | | |
| Address: | | | |
| Phone No.: | | | |
| Bond Amount: | $48,549,668.00 | | |
| Contract No. (If applicable): | H010A, Annex #12 | | |
| Description of Work: | H-J Utility and Pavement Project | | |
| Project Location: | Miami International Airport – South Terminal Expansion<br>Miami, FL | | |
| Legal Description: | | | |

3750 / 900

OFF.REC.BK.

**SURETY PERFORMANCE BOND** 20883PG1609

Bond Nos. 08577177I and 2863671

By This Bond, We Parsons-Odebrecht JV, a Joint Venture, as Principal, whose principal business address is 4450 NW 20th St., Suite 100, Miami FL 33122, as Contractor under the contract dated December 4, 2002, between Principal and Miami-Dade County for the construction of H0J Utility and Pavement Project, Project No. H010A, Annex #12 (hereinafter referred to as "Contract") the terms of which Contract are incorporated by reference in its entirety into this Bond and Fidelity and Deposit Company of Maryland, a Maryland corporation, whose principal business address is 3910 Keswick Rd., Baltimore MD 21211, and American Home Assurance Company, a New York corporation, whose principal business address is 70 Pine St., New York NY 10270, as Sureties, are held and firmly bound to Miami-Dade County (hereinafter referred to as "County") in the sum of Forty Eight Million Five Hundred Forty Nine Thousand Six Hundred Sixty Eight and No/100 (U.S. dollars) $48,549,668.00, for payment of which we bind ourselves, our heirs, personal representatives, successors, and assigns, jointly and severally.

THE CONDITION OF THIS BOND is that if Principal:

1. Performs all the work under the Contract, including but not limited to guarantees, warranties and the curing of latent defects, said Contract being made a part of this bond by reference, and in the times and in the manner prescribed in the Contract, including any and all damages for delay, and
2. Pays County all losses, damages, including damages for delay, expenses, costs and attorney's fees, including appellate proceedings that County sustains because of a default by Principal under the Contract, including but not limited to a failure to honor all guarantees and warranties or to cure latent defects in its work or materials within the time period provided in Section 95.11(3)(c), Florida Statutes; and
3. Performs the guarantee of all work and materials furnished under the Contract for the time specified in the Contract, including all warranties and curing all latent defects within the time period provided in Section 95.11(3)(c), Florida Statutes,

then this bond is void; otherwise it remains in full force.

Surety specifically assumes liability for any and all delay damages arising from Principal's default of the Contract, as well as all latent defects uncovered in the work of the Principal after final acceptance of the work by the County.

Any changes in or under the Contract Documents and compliance or noncompliance with any formalities connected with the Contract or the changes does not affect Surety's obligation under this Bond.

This Bond shall remain in full force and effect for such period or periods of time after the date of acceptance by the County of the Contract work as are provided for in the Contract by which Principal guarantees to repair or replace any or all work performed or materials and equipment furnished, which were not performed or furnished according to the terms of the Contract. If no specific periods of warranty are stated in the Contract for any particular item or work, material or equipment, the warranty shall be deemed to be a period of one (1) year from the date of final acceptance by the County, provided however, that this limitation does not apply to suits seeking damages for latent defects in materials or workmanship, such actions being subject to the limitations found in Section 95.11(3)(c), Florida Statutes.

OFF. REC. BK. 20883 PG 1610

**SURETY PERFORMANCE BOND (Cont'd)**

IN WITNESS WHEREOF, the above bounden parties have caused this Bond to be executed by their appropriate officials as of the 17th day of December 2002.

(SEAL)

Parsons-Odebrecht JV, a Joint Venture
CONTRACTOR

By: [signature]

Name: T.L. McKinley Gilberto Neves

Title: Exec. Committee Members

(CORPORATE SEAL)

Fidelity and Deposit Company of Maryland
SURETY

By: [signature]

Name: William L. Parker

Title: Attorney-in-Fact

(CORPORATE SEAL)

American Home Assurance Company
SURETY

By: [signature]

Name: William L. Parker

Title: Attorney-in-Fact

COUNTERSIGNED BY RESIDENT FLORIDA AGENT OF SURETY

[signature]

William L. Parker

*(Copy of Agent's current identification card as issued by the State of Florida Insurance Commissioner must be attached)*

(Power of Attorney must be attached)

Contract No. H010A, Annex #12

20883PG1611

## SURETY PAYMENT BOND

Bond Nos. 08577177I and 2863671

By This Bond, We Parsons-Odebrecht JV, a Joint Venture, as Principal, whose principal business address is 4450 NW 20th St., Suite 100, Miami FL 33122, as Contractor under the contract dated December 4, 2002, between Principal and Miami-Dade County for the construction of H-J Utility and Pavement Project, Project No. H010A, Annex #12 (hereinafter referred to as "Contract") the terms of which Contract are incorporated by reference in its entirety into this Bond and Fidelity and Deposit Company of Maryland, a Maryland corporation, whose principal business address is 3910 Keswick Rd., Baltimore MD 21211, and American Home Assurance Company, a New York corporation, whose principal business address is 70 Pine St., New York NY 10270, as Sureties, are held and firmly bound to Miami-Dade County (hereinafter referred to as "County") in the sum of Forty Eight Million Five Hundred Forty Nine Thousand Six Hundred Sixty Eight and No/100 (U.S. dollars) $48,549,668.00, for payment of which we bind ourselves, our heirs, personal representatives, successors, and assigns, jointly and severally.

THE CONDITION OF THIS BOND is that if Principal:

1. Promptly makes payments to all claimants as defined in Section 255.05(1), Florida Statutes, supplying Principal with labor, material, or supplies used directly or indirectly by Principal in the prosecution of the work provided in the Contract, which is made a part of this bond by reference, and in the times and in the manner prescribed in the Contract; and
2. Pays County, all loss, damage, expenses, costs, and attorney's fees, including appellate proceedings, that County sustains because of a failure by Principal to make such payments;

Then this bond is void; otherwise, it remains in full force.

A claimant shall have a right of action against the Principal and the Sureties for the amount due it. Such action shall not involve County in any expense.

A claimant, except a laborer, who is not in privity with the Principal and who has not received payment for labor, materials, or supplies shall, within 45 days after beginning to furnish labor, materials or supplies for the prosecution of the work, furnish the Principal with a notice that it intends to look to the bond for protection. A claimant who is not in privity with the Principal and who has not received payment for labor, materials, or supplies shall, within 90 days after performance of the labor or after delivery of the materials or supplies, deliver to the Principal and to the Surety written notice of the performance of the labor or delivery of the materials or supplies and of the nonpayment.

No action for labor, materials or supplies may be instituted against the Principal or the Surety unless both notices have been given. No action shall be instituted against the Principal or the Surety on the bond after one (1) year from the performance of the labor or completion of the delivery of the materials or supplies. A claimant may not waive in advance its right to bring an action under the bond against the Surety.

Any changes in or under the Contract Documents and compliance or noncompliance with formalities connected with the Contract or with the changes do not affect Surety's obligations under this Bond.

**SURETY PAYMENT BOND (Cont'd)**

IN WITNESS WHEREOF, the above bounden parties have caused this Bond to be executed by their appropriate officials as of the 17th day of December 2002.

(SEAL)

Parsons-Odebrecht JV, a Joint Venture
CONTRACTOR

By: ______________________

Name: T.L. McKinley / Gilberto Neves

Title: Exec. Committee Members

(CORPORATE SEAL)

Fidelity and Deposit Company of Maryland
SURETY

By: ______________________

Name: William L. Parker

Title: Attorney-in-Fact

(CORPORATE SEAL)

American Home Assurance Company
SURETY

By: ______________________

Name: William L. Parker

Title: Attorney-in-Fact

COUNTERSIGNED BY RESIDENT
FLORIDA AGENT OF SURETY

______________________
William L. Parker
*(Copy of Agent's current identification card as issued by the State of Florida Insurance Commissioner must be attached)*

(Power of Attorney must be attached)

Contract No. H010A, Annex #12

LIB. REC. OR.

20883PG1613

# Power of Attorney
# FIDELITY AND DEPOSIT COMPANY OF MARYLAND
## HOME OFFICE: P.O. BOX 1227, BALTIMORE, MD 21203-1227

Know ALL MEN BY THESE PRESENTS: That the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a corporation of the State of Maryland, by F. L. BORLEIS, Vice-President, and T. C. JOHNSON, Assistant Secretary, in pursuance of authority granted by Article VI, Section 2, of the By-Laws of said Company, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, does hereby nominate, constitute and appoint **William L. Parker, Joseph M. Pietrangelo and Bayor I. Mimica, all of Miami, Florida, EACH** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: **any and all bonds and undertakings** and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Company, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its office in Baltimore, Md., in their own proper persons. This power of attorney revokes that issued on behalf of William L. Parker, Kaaren Reagan, Frank J. Sioli, Joseph M. Pietrangelo, Olga Iglesias, Juan E. Beltran, E. B. Blondell, Jr., and Gladys M. Ogden, dated March 11, 1998.

The said Assistant Secretary does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article VI, Section 2, of the By-Laws of said Company, and is now in force.

IN WITNESS WHEREOF, the said Vice-President and Assistant Secretary have hereunto subscribed their names and affixed the Corporate Seal of the said FIDELITY AND DEPOSIT COMPANY OF MARYLAND, this 25th day of February, A.D. 2000.

LOOK FOR THE PROTECTION WATERMARK

ATTEST: **FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

SEAL

*T. C. Johnson* — *Assistant Secretary*

By: *F. L. Borleis* — *Vice-President*

State of Maryland } ss:
County Of Harford }

On this 25th day of February, A.D. 2000, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, came F. L. BORLEIS, Vice-President and T. C. JOHNSON, Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and they each acknowledged the execution of the same, and being by me duly sworn, severally and each for himself deposeth and saith, that they are the said officers of the Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and that the said Corporate Seal and their signatures as such officers were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

NOTARY PUBLIC

*Patricia A. Trombetti* — *Notary Public*
My Commission Expires: October 9, 2002

L1428-031-2075

OFF.REC.BK.

20883PG1614

**EXTRACT FROM BY-LAWS OF FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

"Article VI, Section 2. The Chairman of the Board, or the President, or any Executive Vice-President, or any of the Senior Vice-Presidents or Vice-Presidents specially authorized so to do by the Board of Directors or by the Executive Committee, shall have power, by and with the concurrence of the Secretary or any one of the Assistant Secretaries, to appoint Resident Vice-Presidents, Assistant Vice-Presidents and Attorneys-in-Fact as the business of the Company may require, or to authorize any person or persons to execute on behalf of the Company any bonds, undertaking, recognizances, stipulations, policies, contracts, agreements, deeds, and releases and assignments of judgements, decrees, mortgages and instruments in the nature of mortgages,...and to affix the seal of the Company thereto."

**CERTIFICATE**

I, the undersigned, Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the original Power of Attorney of which the foregoing is a full, true and correct copy, is in full force and effect on the date of this certificate; and I do further certify that the Vice-President who executed the said Power of Attorney was one of the additional Vice-Presidents specially authorized by the Board of Directors to appoint any Attorney-in-Fact as provided in Article VI, Section 2, of the By-Laws of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND.

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 10th day of May, 1990.

RESOLVED: "That the facsimile or mechanically reproduced seal of the company and facsimile or mechanically reproduced signature of any Vice-President, Secretary, or Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed."

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the said Company, this

17th day of December, 2002.

S. D. Mattie

*Assistant Secretary*

20883PG1615

**American Home Assurance Company**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
Principal Bond Office 70 Pine Street, New York, N.Y. 10270

**POWER OF ATTORNEY**

No. 83-B-6978

**KNOW ALL MEN BY THESE PRESENTS:**

That American Home Assurance Company, a New York corporation, and National Union Fire Insurance Company of Pittsburgh, Pa., a Pennsylvania corporation, does each hereby appoint

**---Joseph Pietrangelo, William L. Parker, Davor Mimica: of Coral Gables, Florida---**

[illegible] and lawful Attorney(s)-in-Fact, with full authority to execute on its behalf bonds, undertakings, recognizances and other contracts of indemnity and writings obligatory in the nature thereof, issued in the course of its business, and to bind the respective company thereby.

IN WITNESS WHEREOF, American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, Pa. have each executed these presents

this 22nd day of December, 1999.

Lawrence W. Carlstrom, Senior Vice President
National Union Fire Insurance Company of Pittsburgh, PA.
Vice President, American Home Assurance Company

STATE OF NEW YORK }
COUNTY OF NEW YORK }ss.

On this 22nd day of December, 1999 before me came the above named officer of American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, Pa., to me personally known to be the individual and officer described herein, and acknowledged that he executed the foregoing instrument and affixed the seals of said corporations thereto by authority of his office.

JOSEPH B. NOZZOLIO
Notary Public, State of New York
No. 01-NO4[illegible]
Qualified in Westchester County
Term Expires [illegible]

## CERTIFICATE

Excerpts of Resolutions adopted by the Boards of Directors of American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, Pa. on May 18, 1976:

"**RESOLVED**, that the Chairman of the Board, the President, or any Vice President be, and hereby is, authorized to appoint Attorneys-in-Fact to represent and act for and on behalf of the Company to execute bonds, undertakings, recognizances and other contracts of indemnity and writings obligatory in the nature thereof, and to attach thereto the corporate seal of the Company, in the transaction of its surety business;

"**RESOLVED**, that the signatures and attestations of such officers and the seal of the Company may be affixed to any such Power of Attorney or to any certificate relating thereto by facsimile, and any such Power of Attorney or certificate bearing such facsimile signatures or facsimile seal shall be valid and binding upon the Company when so affixed with respect to any bond, undertaking, recognizance or other contract of indemnity or writing obligatory in the nature thereof;

"**RESOLVED**, that any such Attorney-in-Fact delivering a secretarial certification that the foregoing resolutions still be in effect may insert in such certification the date thereof, said date to be not later than the date of delivery thereof by such Attorney-in-Fact."

I, Elizabeth M. Tuck, Secretary of American Home Assurance Company and of National Union Fire Insurance Company of Pittsburgh, Pa. do hereby certify that the foregoing excerpts of Resolutions adopted by the Boards of Directors of these corporations, and the Powers of Attorney issued pursuant thereto, are true and correct, and that both the Resolutions and the Powers of Attorney are in full force and effect.

**IN WITNESS WHEREOF**, I have hereunto set my hand and affixed the facsimile seal of each corporation

this 17th day of December 2002

Elizabeth M. Tuck, Secretary

RECORDED IN OFFICIAL RECORDS BOOK
OF DADE COUNTY, FLORIDA
RECORD VERIFIED
HARVEY RUVIN
CLERK CIRCUIT COURT

65166 (4/99)

FILED by TS D.C.

NOV, 18, 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as r[equired] by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of [Court for the purpose of initiating] the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed C[ases Below.]**

## I. (a) PLAINTIFFS

Fisk Electric Company

(b) County of Residence of First Listed Plaintiff Texas
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorney's (Firm Name, Address, and Telephone Number)

Herman Braude, Esq. / Braude & Margulies, P.C.
1200 Potomac St., NW / Washington, DC 20007
(Tel) 202-471-5400

## DEFENDANTS

Travelers Casualty and Surety Company; American Home Assurance Company; Fidelity and Deposit Company of Maryland

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

Filed

(d) Check County Where Action Arose: ✓ MIAMI-DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
✓ 4 Diversity (Indicate Citizenship of Parties in Item III)

Miami 08cv 23210 moore/Simonton

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ✓ 5 | ✓ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☒ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

✓ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed- (see VI below) ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ✓ NO b) Related Cases ✓ YES ☐ NO

JUDGE James Lawrence King DOCKET NUMBER 08-22921 Civ-King

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause **(Do not cite jurisdictional statutes unless diversity)**:

28 U.S.C. 1332: Trade Contractor's claims against Little Miller Act and common law payment bonds

LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** 1,281,799.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ✓ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

SIGNATURE OF ATTORNEY OF RECORD s/ Herman Braude

DATE November 17, 2008

FOR OFFICE USE ONLY

AMOUNT $350.00 RECEIPT # 990594 IFP

11/18/08